CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

APR 24 2012

JULIA C. DUDLEY, CLERK
BY: /s/
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREGORY THOMAS MILLER,<br>*Defendant.* | No. 6:11–cr–00004<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Defendant Gregory Thomas Miller seeks suppression of all evidence obtained from a search of his laptop computer and other electronic effects, arguing that the Application and Affidavit for Search Warrant ("Affidavit"), *see* docket no. 41 attach. 1, contained certain facts and omitted certain material facts, which, if excluded or included, respectively, would destroy probable cause for the search. Out of an abundance of caution, I granted Defendant's Motion for a *Franks* Hearing (docket no. 82), which was held on April 18, 2012. After the hearing, I orally denied Defendant's Motion to Suppress; I memorialize my reasoning herein.

### I. BACKGROUND

I have discussed the alleged facts of this case at length in other opinions. For the sake of clarity, however, I reiterate those alleged facts before describing the facts that Defendants alleges have newly come to light.

#### A. Previously Alleged Facts

I have gleaned most of the following facts from Special Agent James Lamb's Affidavit. Where specifically indicated, some facts come from the parties' earlier filings with the Court.

On October 16, 2010, National Parks Service ("NPS") Rangers stopped Defendant's truck at a DUI checkpoint on the Blue Ridge Parkway in Rockbridge County, Virginia. An NPS Ranger's check revealed that Miller's Louisiana driver's license had been suspended, and a Missing Persons/Runaway report on L.A.J. had been recorded with the National Crime Information Center (NCIC). The Defendant was a passenger in the vehicle; a sixteen year-old girl, "L.A.J.," was driving, unlicensed. L.A.J. and Defendant are not related. The girl admitted that she was from Michigan, and that her parents did not know she had left home with Miller. L.A.J. indicated that she and Miller drove from Michigan to Maryland before arriving in Virginia, sharing hotel rooms on two separate nights. L.A.J. initially denied that Miller took any pictures of her during the trip, but she later acknowledged that he had indeed taken photographs of her as they traveled.

Law enforcement asked Miller and L.A.J. to exit the vehicle and proceeded to question the pair. Miller indicated L.A.J. sent him a text message containing directions to her home, and that he traveled from his home in Louisiana to Michigan in order to pick her up. According to Lamb's Affidavit, Miller indicated that his intent in undertaking this entire venture was to "talk to [L.A.J.'s] Dad . . . to sign emancipation papers." Miller further stated that, while en route to Michigan, he stopped at a sex toy shop, buying several items. For purposes of this Opinion, it is sufficient to observe that such items are of the type generally intended for use in sexual encounters.

After Miller had gotten out of the truck, Ranger Marc Cyr observed a marijuana seed on the seat. According to testimony at the October 28 suppression hearing, Cyr, Ranger Kathryn Brett, and as many as seven or eight other law enforcement officers proceeded to search the truck in accordance with Park Service Procedures requiring that the contents of Miller's truck be

inventoried and the truck be towed. Ranger Jon Holter conducted the inventory and arranged for the towing.

During the stop and search, NPS Rangers and other law enforcement officers observed and seized over seventy items, including two glass pipes with marijuana residue; one smoked marijuana cigarette; marijuana seeds and leaves; a Toshiba Satellite laptop computer; six thumb drives; thirteen secure digital (SD) memory cards; a Fuji FinePIX S700 digital camera; a four gigabyte memory stick; 4x DVD-R 1.4 GB/30 minutes (writeable DVD(s)); and a Sony Handycam hybrid. Sometime later, Ranger Cyr asked Miller for his consent to allow Cyr to examine the contents of the laptop computer, but Miller refused, indicating that the computer contained pictures of his girlfriend that she would not want anyone to see.[1]

In a prior Motion to Suppress (docket no. 41), Defendant asserted that the officers "searched the contents [of his computer] without his consent," trying first to use the computer as they found it, but finding the battery dead. The officers then allegedly played files from thumb drives on an officer's own laptop computer in the patrol car, and announced that they had "hit the mother lode." Defendant alleged that the warrantless search took approximately two hours. None of the allegations in the foregoing paragraph are included in the Affidavit, and the United States and Ranger Cyr disputed both the allegation that anyone attempted to access the computer or his storage devices at the scene, and the allegation that anyone announced that he or she had hit the "mother lode." Ranger Cyr does admit that he later improperly looked at photographs on Miller's digital camera without Miller's consent; it contained non-pornographic photographs of L.A.J. on her trip from Michigan to Virginia. Cyr testified that he did not inform Special Agent

---

[1] As discussed below, Miller disputes whether he used the word "pornographic" in connection with this statement, although the Affidavit uses that word. At the April 18th hearing, Cyr testified that he did not think Miller used the word "pornographic."

Lamb that he had looked at those images, and Lamb testified that he did not include that information in his Affidavit because he was unaware of it.

On the night of the stop, Miller was charged with possessing marijuana and contributing to the delinquency of a minor.[2] Both are petty offenses. According to the Government's Response to Defendant's Motion to Suppress (docket no. 53), during his trip to the Charlottesville-Albemarle Regional Jail, Miller waived his *Miranda* rights and discussed some of his history with L.A.J. He claimed that L.A.J. did not know about the sex paraphernalia he had in the back of the truck.

Finally, the Affidavit recounts certain information that Special Agent Lamb received after calling L.A.J.'s mother during his subsequent investigation, including the fact that for about one year, L.A.J. lived with her mother and other family members in a trailer home located on Miller's property. One day during that period, L.A.J.'s mother came home after work, and did not find L.A.J. at home as she expected; after a search, she found L.A.J., Miller, and another minor female all asleep in Miller's bed in his nearby trailer. All three individuals were clothed. L.A.J.'s mother moved the family from the property shortly thereafter.

### B. Defendant's Newly Alleged Facts

Defendant's Motion for a *Franks* Hearing alleged the following new facts. First, Defendant alleges that on the night of Defendant's arrest (but after the arrest took place), L.A.J. "had 'been removed as a runaway/adv where she was,' according to a police NCIC report . . . ." Def.'s *Franks* Mot. 5. Second, Miller alleges that on the night he was arrested, he showed one of the NPS Rangers his cell phone, which contained a text message he had received from L.A.J.'s

---

[2] The Affidavit summarizes Virginia Code § 18.2-371, entitled "Causing or encouraging acts rendering children delinquent, abused, etc." The Affidavit indicates that this provision makes it illegal for any person 18 years or older to willfully contribute to, encourage, or cause any act, omission, or condition which renders a child delinquent, in need of services, in need of supervision, or abused (as defined elsewhere in the Virginia Code).

4

father, indicating that the father, who had joint custody of L.A.J., was aware that she and Miller were traveling together and on their way to Texas. *Id.* Third, Defendant alleges that Ranger Cyr, who admitted to improperly looking at pictures on Miller's digital camera, also may have looked at *videos* on that camera. Further to this point, Defendant alleges that after was released from custody, authorities released his truck, but refused to return his video or computer equipment. Defendant contends this fact raises questions about what the officers actually knew when they applied for the search warrant. *Id.* Finally, Defendant reiterates that he did not specifically state that there were "pornographic" pictures of his girlfriend on his computer, but rather just stated that his girlfriend *in Louisiana*, *i.e.*, someone other than L.A.J., would not want anyone else to view those photographs. *Id.*

Additionally, at the *Franks* hearing, counsel for Defendant questioned Cyr and Lamb about certain other alleged omissions, including the fact that Defendant told Cyr that he and L.A.J. had stayed in separate beds in the hotel room they shared, and that the sex toys Defendant bought while en route to Michigan were meant for someone else.

## II. APPLICABLE LAW

### B. *Franks* Hearing for Misrepresentations or Omissions in Affidavit

When a defendant seeks to obtain a *Franks* evidentiary hearing on an affidavit's integrity because the affidavit allegedly contains false or misleading information, a defendant must

> make[] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

5

*Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Omissions are treated slightly differently; when a defendant seeks a *Franks* hearing by alleging omissions in an affidavit, the defendant must first

> show[] that [the officers] omitted material facts that when included would defeat a probable cause showing—i.e., the omission would have to be necessary to the finding of probable cause—*and* that the omission was designed to mislead or was made with reckless disregard of whether it would mislead.

*United States v. Blauvelt*, 638 F.3d 281, 289 (4th Cir. 2011). Out of an abundance of caution, I granted the *Franks* evidentiary hearing that is the subject of this Opinion.

At the *Franks* hearing itself, if the defendant can establish that the affiant officer indeed made (or omitted) such statements, and setting that material to the side (or including the omissions), the court determines that the remaining content is insufficient to support a finding of probable cause, then the warrant must be voided, and the fruits of the search excluded. *Id.* at 156. Significantly, the defendant has the burden. *Franks*, 438 U.S. at 171 ("There is a strong "presumption of validity with respect to the affidavit."). And in the omissions context, "the burden on the defendant is even higher because the affidavit 'cannot be expected to include every piece of information gathered in the course of an investigation.'" *United States v. Bell*, 692 F. Supp. 2d. 606, 610 (W.D. Va. 2010) (quoting *United States v. Tate*, 524 F.3d 449, 454–55 (4th Cir. 2008)).

### III. Discussion

#### A. Imputing Other Rangers' Knowledge to Affiant

At the outset, I address the fact that Cyr relayed certain information to Agent Lamb, the affiant, and therefore Lamb might not have known all of the facts that Cyr knew. Defendant has argued that Ranger Cyr's omissions should be imputed to Agent Lamb.

While the United States Court of Appeals for the Fourth Circuit has "not . . . impute[d] knowledge of facts to an officer seeking a warrant merely because such facts are accessible to the law enforcement community at large," *Blauvelt*, 638 F. 3d at 289, a deliberate misrepresentation or omission is treated differently. That is, "the Supreme Court noted in *Franks* that 'police [can]not insulate one officer's deliberate misstatements merely by relaying it through an officer-affiant personally ignorant of its falsity.'" *United States v. Brown*, 298 F.3d 392, 408 (5th Cir. 2002) (alteration in original) (quoting *Franks*, 438 U.S. at 164 n.6)); *accord United States v. Wapnick*, 60 F.3d 948, 956 (2d Cir. 1995); *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992) ("A deliberate or reckless omission by a government official who is not the affiant can be the basis for a *Franks* suppression.").

Despite the Fourth Circuit's narrow statement in *Blauvelt* regarding the collective knowledge doctrine, *Franks* itself sensibly constrains the ability of the Government to protect itself against knowing or reckless misrepresentations or omissions by merely "passing the buck" to another affiant. So while generally innocuous facts not disclosed by the law enforcement officers on the scene to Agent Lamb would not be imputed to him as the affiant, if any officer deliberately misrepresented or withheld material information from Lamb, that act or omission can serve as a basis for exclusion.

## B. *Franks* Hearing

I observe that the Fourth Circuit "has construed the Supreme Court's opinion in *Franks* . . . very strictly . . . ." *Simmons v. Poe*, 47 F.3d 1370, 1383 (4th Cir. 1995). Furthermore, I bear in mind the fact that "warrant affidavits 'are normally drafted by nonlawyers in the midst and haste of a criminal investigation.'" *United States v. Clenney*, 631 F.3d 658, 665 (2011) (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)).

7

To reiterate, the Affidavit sworn out by Special Agent Lamb mentions all of the following facts: that Park Rangers stopped Miller, who was then fifty-seven years old, in a vehicle with sixteen year-old L.A.J., a non-relative (¶¶ 9–10, 13); that Miller traveled from Louisiana to Michigan to pick up L.A.J. (¶ 16); that Miller said he intended to take L.A.J. to Texas so that her father could sign emancipation papers (¶ 17);[3] that L.A.J. was reported as a missing person/runaway on the NCIC report (¶ 15); that, while en route to Michigan, Miller stopped and purchased items for sale in a sex toy shop (¶ 16); that Miller had taken L.A.J. from her home without her mother's permission (¶ 17); that Miller and L.A.J. shared two hotel rooms during the course of their journey (¶ 18); that L.A.J., after initially denying it, acknowledged that Miller had taken photographs of her as they traveled (¶ 19); that the NPS Rangers observed and seized drug paraphernalia, a laptop computer, numerous digital storage devices, a portable camcorder, and a digital camera (¶ 20); that Miller indicated that the computer contained pornographic[4] pictures of his girlfriend that she would not want law enforcement to view (¶ 21); and finally, that Miller and L.A.J. knew one another since at least 2008, when L.A.J.'s mother witnessed Miller asleep in the same bed with L.A.J. and another minor female, although all parties were clothed (¶ 23).

Previously, I determined that the foregoing (generally uncontroverted) facts compelled me find that the magistrate judge had a substantial basis to believe that the Affidavit established probable cause to issue a search warrant; I therefore denied Defendant's first Motion to Suppress. (*See* docket nos. 56 and 57). Defendant now argues that the facts described in Part

---

[3] The most direct route from Michigan to Texas obviously does not include the Blue Ridge Parkway in Rockbridge County, VA. (The Affidavit does not indicate which city in Michigan the pair departed from, but suffice it to say that one has to drive several hundred miles eastbound to get to Rockbridge County before heading back westbound to Texas). While the Affidavit does not include this precise insight, it is a fact that could rightly make a magistrate skeptical of Miller's explanation for what he was doing with the girl.

[4] Again, Defendant and Ranger Cyr agree that Defendant never said "pornographic," but the Affidavit includes the term.

I.B., *supra*, were deliberately omitted from (or, in the case of the "pornography" allegation, improperly included in) the Affidavit, and that, if included (or if "pornography" was removed), the Affidavit would have lacked probable cause for a search warrant to issue. I address these alleged facts, in turn, below.

### 1. NCIC Report

First, Defendant claims that, later on the night of his arrest, L.A.J. was "removed as a runaway/adv where she was," according to the NCIC report. In my view, this fact, if disclosed to the magistrate, would have had little bearing, if any, on the probable cause finding. After L.A.J. was located, it seems only natural that the NCIC report would be updated to reflect that she was *no longer* considered a runaway; significantly, the update cannot be read to indicate that L.A.J. *never was* a runaway or otherwise reported missing. Given the other affirmative statements already contained in the Affidavit, this fact would not have undercut the likelihood that L.A.J. had been the victim of exploitation during her time away from home with Defendant, and that the articles listed in the search warrant contained evidence of those crimes.

### 2. Text Message

Next, Miller states that he "showed one of the NPS Rangers a text message on his cell phone from L.A.J.'s father, showing that the father, who had joint custody, was aware that [L.A.J.] and Miller were traveling together and [L.A.J.'s father] was expecting them to arrive at his residence shortly." Cyr testified that Miller did tell him that he had received text messages from L.A.J.'s father, but denied that Miller ever physically showed him a phone containing such messages.

Again, though, the relevant question is, if the magistrate been advised of this fact, would it have undercut the other statements contained submitted in the Affidavit, such that probable cause would be destroyed? In my view, even if L.A.J.'s father knew that she was with Defendant, that fact would not negate the probable cause established by other facts already described. Moreover, as mentioned in note 3, *supra*, Defendant and L.A.J. were *nowhere near* Texas, and arguably heading away from it. The directional bearing from Michigan to Rockbridge County, VA is basically due southeast. Defendant claims that this alleged text message proves that L.A.J.'s father knew that she and Miller were driving to Texas from Michigan, but, to me, and to perhaps the magistrate judge, that fact would only indicate that L.A.J., or Miller, or both, had misled L.A.J.'s father about their circuitous trip from Michigan. The alleged omission would therefore only strengthen the existence of probable cause that L.A.J. had been the victim of child exploitation, and that Miller's belongings would contain evidence of that exploitation.

### 3. Cyr's Viewing of the Camera and Retention of Seized Electronics

Third, Defendant claims that, in addition to still images Ranger Cyr admitted to viewing, he might have also viewed the video images allegedly contained on Defendant's "still" camera. At the *Franks* hearing, counsel for Defendant attempted to demonstrate that Cyr could not have viewed the pictures or videos on the main LCD screen of the still camera, as he testified he did, because that screen was cracked and not functional. Defendant claims, therefore, that Cyr's testimony about his viewing of the "still" camera was misleading, and that this fact, coupled with law enforcement's retention of Defendant's belongings after his arrest (but before the search warrant was signed) "raise[s] questions about what the officers knew when they applied for the search warrant and whether such illegal searches and seizures affected their decision to seek a

warrant . . . ." Def.'s *Franks* Mot. 8. Defendant argues that the foregoing tends to support an inference that Cyr (or someone else in law enforcement) did more than just glance at the still camera.

It is quite common knowledge that most digital "still" cameras, in this day and age, are capable of capturing live video. Even if Cyr claims to have said that he only viewed the "still" camera, it would be a stretch to infer that Cyr said so for purposes of deliberately misleading anyone into believing that he did not also view video footage contained on that camera; the more likely explanation is that Cyr was just being accurate; that is, he said he viewed the "still" camera because that is what such a camera is commonly called, despite it being capable of storing video files. Also, to the extent Cyr indicated that he viewed the photographs on the camera's broken exterior LCD screen, I attribute that indication to Cyr's mistaken recollection, not to a nefarious attempt to mislead the Court. Moreover, it has since become clear that, at the time of Cyr's viewing, the camera did not contain any incriminating photographs that would be visible to a non-expert reviewer. Cyr, therefore, would not have been able to view any inculpatory photographs or video, let alone deliberately misrepresent the fact that he did. If I were to assume that the Affidavit included the fact that Cyr did improperly look at the camera (including, perhaps, videos held on its internal storage), I cannot, without more, go on to conclude that that fact would destroy probable cause.

Furthermore, the fact that Miller's seized electronics were retained well after he was released from custody is not omitted from the Affidavit. Agent Lamb's Affidavit clearly states that "[t]he items identified in Attachment A seized on October 16, 2010 are currently being held in an evidence locker at the Montebello Rangers Station located within the Western District of Virginia." Aff. ¶ 25.

To be sure, if a law enforcement officer did illegally look at Defendant's computer and found videos containing child pornography, then that is a significant fact that is not contained in the Affidavit. However, that fact would have only strengthened probable cause.[5] Moreover, it seems that Defendant's allegations are based on pure speculation. Pretrial discovery and testimony at the *Franks* hearing did nothing to bolster Defendant's unsupported claim that law enforcement impermissibly viewed his computer or other devices, and prompted them to seek a search warrant. While I granted the *Franks* hearing out of an abundance of caution, I will not suppress evidence as an exercise in prudence.

### 4. "Pornographic" Pictures

In describing the photographs of his "girlfriend" found on his computer, Defendant claims that he did not use the word "pornographic," and that he specifically indicated that those photographs were of his girlfriend *in Louisiana*. He claims that his statements should not have been construed to either be pornographic in character, or to refer to L.A.J., and that his disclaimers should have been included in the Affidavit.

In my view, the statement about there being "pornographic pictures on this computer of his girlfriend," Aff. ¶ 21, serves as probably the strongest single basis for the magistrate's probable cause finding—at least for the child pornography charge. Although the Affidavit discusses other photographs Miller took of L.A.J., Aff. ¶ 19, this alleged statement is the one direct mention of "pornography," and, as written, it seems to imply that the subject of said pornography was L.A.J., not some other unnamed girlfriend.

---

[5] One can easily imagine why a law enforcement officer would omit the fact that he improperly and illegally viewed evidence from his Affidavit. For instance, one can imagine that an officer might omit that fact that an illegal search took place because he feared that any evidence obtained from the search would be suppressed. When considering suppression under *Franks*, however, the Court is not concerned with what can be imagined; rather, it is concerned with what has been shown by a preponderance of the evidence. Defendant has raised questions and made inferences about officer motives, but these showings fall far short of satisfying Defendant's burden under *Franks*.

Ranger Cyr testified at the *Franks* hearing that although he could not remember exactly what was said on the night of Miller's arrest, Miller never used the word "pornographic" in describing the images on his computer, and that he (Cyr), in turn, never used that word when giving his information to Special Agent Lamb. Lamb's inclusion of the word, then, is a misrepresentation, but I deem it an innocent characterization of what he heard from Cyr, not a deliberate intent to mislead the magistrate. Furthermore, I observe that even if Lamb had not editorialized Cyr's description, and had instead more accurately used something akin to "pictures that Miller indicates his girlfriend would not want law enforcement to see" in his Affidavit, I cannot conclude that such accuracy would have destroyed the magistrate's finding of probable cause, given the other facts alleged.

### 5. Other Alleged Omissions

At the *Franks* hearing, counsel for Defendant questioned Lamb and Cyr about certain other alleged omissions, including the fact that Defendant told Cyr that the sex toys in his vehicle were intended for someone else, and that L.A.J. had slept in a separate bed while sharing hotel rooms with Defendant.

"An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). This Court cannot demand that an affiant officer include in his or her affidavit every excuse given by an arrestee-defendant for what appears, on its face, to be suspicious or incriminating evidence. The affiant's job is not to determine guilt, or to vigorously investigate the truth of every statement made by an arrestee. I found Agent Lamb to be both candid and credible when he testified that he included certain information in an effort to be more accurate,

13

despite some of that information clearly reducing the likelihood that the magistrate would find probable cause to issue a search warrant.[6]

I reiterate the position I outlined at the hearing: the magistrate judge was presented with a bundle of facts, which, together, demonstrate to any reasonable observer that something was amiss. Even if I assume that certain facts were omitted or misrepresented with intent to mislead or with reckless disregard to whether they would mislead, I do not conclude that probable cause for a search would have been vitiated if those facts had been reported accurately in the Affidavit.

## IV. CONCLUSION

Defendant has failed to make the requisite showing that the alleged omissions and misrepresentations sufficiently undercut the magistrate's finding of probable cause that the items seized from Defendant's vehicle would contain evidence or fruits or instrumentalities of federal or state exploitation crimes, given the other facts properly alleged. In short, Defendant has failed to meet his burden, and as I stated on the record at the April 18, 2012 hearing, I will not suppress the evidence found pursuant to the search warrant.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion to all parties of record.

Entered this 24th day of April, 2012.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[6] For example, Lamb included the fact that when L.A.J.'s mother found her in bed with Miller asleep, all parties were clothed.

14